Good morning, your honors. May it please the court, my name is Rebecca Herbst and I represent defendant appellant Milton Glick, who at all times relevant to this case was the provost at Arizona State University. The issue before this court is whether Dr. Pettit could hold property rights in two non-faculty appointments at Arizona State University, in addition to his tenured faculty role. Dr. Pettit's claim fails under the qualified immunity analysis under both steps. First... Excuse me, just so that I can understand the case. I thought that what you wanted to do was secure immunity and that wouldn't have necessarily anything to do with whether or not Dr. Pettit has property rights in the chair or in the directorship. It would be whether Professor Glick or Mr. Glick reasonably thought that he did not. Isn't that what we're looking at for qualified immunity? That is in part, and that is the second step of the saucier prong. And what we have argued in our briefs is, you're correct, your honor, under the second step there was no evidence to show that Dr. Glick would know. And if that were true, then you wouldn't worry about the first step because it wouldn't matter to Dr. Glick. Respectfully, I disagree with you, your honor, because if that were true and this court were to rule in Dr. Glick's favor only on the second step, then it could go back to the district court for a trial on the first step of the saucier analysis because Dr. Pettit would have the ability to prove a property right under the first step in terms of Dr. Glick. And if that were true, then you wouldn't worry about Dr. Glick's official capacity. And you got a tougher time there because summary judgment was denied, and the district court decided that there was a material fact as to whether or not there – and then we get into the statement of the President, et cetera. But we're not bound, we're not bound at all to do anything other than decide the second if we choose to do so. If you choose to do so – Because you can see the problem, you have to overcome summary judgment on the first. On the second, you don't. Correct, your honor. However, in terms of qualified immunity, we have assumed all of the facts as Dr. Pettit states them do not rise to a property level under the first step. So even assuming – You're saying that there's no fact in material fact in dispute. Exactly, your honor. We're saying, assuming his facts as he says them to be true – Don't save some time for number two, though, will you? Well, your honor, I'd be glad to start with number two if you – Well, let me – may I ask you a specific question that to me may bear on both of these questions. Many of the cases that the parties have cited are from before 1996, and in 1996, there was a new statute in Arizona that, to my reading, seems to have done away to some extent with the concept of implied contracts. Does that statute, which I think is 23-1501, does that have any application in this case? It does not, your honor, because the statute is not retroactive. Because Dr. Pettit was appointed to the director's position in 1975 and the Dalton chair in 1986, that statute would not apply to the specific facts in this case. So on the first point, the district court believes there's a factual issue as to the ability to have a property right in these two positions. And you said, no, there's no factual issue. So it would help if you started off and told us why. Sure. I will gladly start with the first prong. To determine whether a person has a property right, the Supreme Court has instructed you must look at State law. Under Arizona law, the employment with State universities is governed by the Arizona Board of Regents. The Arizona Board of Regents has its policies, along with Arizona State University's specific policies, that explain how tenure may be granted. Under those policies, tenure may only be granted by specific notification from the president and to an employee in a faculty position. But why is the label tenure even important in this sense? If the president, and I know you don't accept these facts, but if the president of the university said, for example, in writing, you will hold the Dalton chair so long as you hold your faculty position and are in, you know, reasonable mental and physical health to perform the duties thereof, it's not tenure, but it's a term of, it's a contract with a term of duration in it. Why is tenure even relevant? You're correct, Your Honor. We're truly talking about property rights. I think the parties have been calling it tenure because in an academic institution it's typically referred to as tenure. Yes, but the reason I'm asking is that if it's not really tenure that anybody's talking about, then if it's just a contractual duration term, then all of the stuff that you've said about the law governing tenure is not relevant. Is there any Arizona law that would prohibit the president of a university from appointing someone to a directorship or a chair for a term to be coextensive with their term as a faculty member? The law, the Arizona Board of Regents policies on administrative appointments clearly state that an administrative appointment has no clear expectation or has no expectation of a property right. So that would be the law that would apply. And we've cited to the definition of an administrative employee as one who promulgates policies, is in charge of the organizational budget, various matters. But let me just be sure I understand. Your view is that a position with the university can only be in one of two boxes. It can either be a faculty position where tenure applies or it can be an administrative position where there's a prohibition against foreverness, for lack of a better word, and there's no third box. Is that your position? Not quite, Your Honor, because the Dalton chair and endowed chair, there really is no box that those fall in. There are also other positions at the university that might not be technically an administrative position, but you can have a staff instructor position that would not be tenure eligible. There are other ones. But let me ask you about the Dalton chair, and I'm wondering, as I read the Dalton chair agreement, basically it said that the Dalton chair goes to the person who's head of the institute. Yes. Right? So why doesn't that in a way fall out? So if a person could be terminated as director of the institute, doesn't the Dalton chair agreement say you have to be the head of the institute to get the Dalton chair? You are exactly correct, Your Honor. So we're now back to one position, and that is the directorship of the cancer institute. Exactly. And your client, I mean, not your client, Mr. the doctor here, Pettit, has tenure, has academic tenure, which is undisturbed by this lawsuit. Is that correct? That is correct. So he remains as a tenured academic faculty at ASU. That is absolutely correct. So the question we have to decide is whether there's a property interest and then a question about it really is that the single position, the director of the cancer research institute. Exactly. So what are the documents and what's the law that you say is no factual issue? The law is under the Arizona Board of Regents policies that director's positions are administrative positions that have no expectation of employment. That was the policy in effect in 1975 when he was appointed to the cancer research institute. It's the policy that still is in effect now. Additionally, he absolutely fits the definition of an administrative employee. We quoted that policy. I won't give it to you verbatim. He agreed. He fit that definition. Additionally, all of the officials in this case testified that director's positions were administrative. And Dr. Pettit was always listed in the general catalogs and graduate catalogs at Arizona State University under the administrative personnel heading. So what do you do with these, like Dr. No, I guess he was a professor and President Kinzinger and those people who say, my understanding was, and when he got this chair in this cancer research institute, my understanding was X. What do we do with those in terms of whether they raise a factual issue? They do not raise a factual issue, Your Honor, because under Kamin versus the Arizona Board of Regents and other Ninth Circuit law, employees and persons are bound to know what the officials have the authority to grant. So although the President or Dr. Kinzinger might have believed these were lifetime appointments, they did not have the authority to grant a lifetime appointment to either position. I am about out of time. I would like to reserve a little bit of time for rebuttal unless you have further questions. I did not address your point 2 yet. I apologize. Why don't you do that briefly. Okay. And we'll give you some rebuttal time. Thank you, Your Honor. In addressing the second step of the sauté pron, there's absolutely no evidence to show that Dr. Glick would have known that these were tenured positions or positions that held a property right. Dr. Pettit was appointed to the CRA in 1975. There were no policies, no written documents, no promises of tenure or a lifetime position. In 1986, he was appointed as the Dalton Chair. Again, there's no written documents, no policies that he would say he would have a lifetime appointment. It's not until 2004, close to 20 years later, that the Provost non-renews him from those positions. And there's nothing in writing to give him reason to believe that he would have had tenure or a property right. Additionally, Dr. Pettit did not present the declarations from the former officials until three months later. So, again, it was after Dr. Glick removed him that the first inkling ever arose that Dr. Pettit believed he had tenure or a property right in the positions. Therefore, we believe that you can grant qualifying immunity and should do so on the first step in this case so that it resolves all issues. But if not the first, certainly can on the second step. Thank you. Thank you. May it please the Court. My name is Thad Geyer from Medford, Oregon, representing the plaintiff, Appellee. I'd like to read one short paragraph, if I could, to the Court. And this is from the what we call the Dalton appointment letter. And I'm reading from excerpts of the record, volume 3, tab 198, page 28. It's the last paragraph. And it states as follows. Bob Pettit is a scholar of the. This is from whom to whom? This was back from, just a second, from Nelsons and Kissinger back at the time that the Dalton was created, that the Dalton chair was created. But what kind of document is this?  It is a memorandum from President Nelson through Jack Kissinger from Samuel Kirkpatrick. So these were the leaders at the time. And it's dated 1986. And the subject line is recommendation of formal appointment for Professor George R. Pettit to hold the Dalton chair of cancer research and medical chemistry. And the paragraph that I wanted to read is this. Quote, Bob Pettit is a scholar of substantial international reputation in the field of cancer research and medicinal chemistry, and he has brought considerable distinctions to the university. Equally important, he has built a thriving research group and has personally dedicated his life's work as a scholar to thwart and cure this deadly disease, unquote. He then, because he was held in such renown, was essentially given the Dalton chair and subsequently, per the agreement, the Cancer Research Institute, because as you pointed out, Your Honor, they were linked. You couldn't have one without the other. But it was because of who he was. And it was the first endowed chair at Arizona State University. And so as pointed out throughout the evidence that we've cited, which is not disputed, is there simply was no written policy in place. In fact, there was not even an oral policy. I would like to ask you to differentiate between the directorship and the Dalton chair, because they may be, at least to me, seem somewhat distinct. All of the correspondence and all of the statements that your client made concerned discussions about the chair position. What specific policies or contractual promises of duration were made to him in this record with respect to the director position? We don't have anything specific as to the director position of the CRI. It simply follows by virtue of the fact of the Dalton chair. To be the Dalton chair, you must be the director of the CRI, so they're linked. So let's just say that there's no, assume if there's no property interest in the directorship and one could be terminated from the directorship, then based on what you just said, you would lose the Dalton chair, correct? You, I suppose theoretically you could, you would lose the Dalton chair, but because your assumption was assuming there is no tenure, et cetera. Well, assuming on the directorship of the cancer center that there is the ability to terminate. In other words, it's not a guaranteed lifetime appointment. Just assume. I know you disagree with that. Right. Just assume that were the case. Then if the directorship is not a lifetime appointment and that falls, the chair there go falls because it's tied to the directorship, correct? It would not automatically fall. You would have to be removed from it or else be, or else the university would be accepting these millions of dollars from the Dalton endowment contrary to the terms of the endowment. So it wouldn't automatically fall. The university would have to take the next step and just violate the endowment terms. So on the directorship of the cancer institute, that is not a faculty track position in terms of tenure track faculty, is it? You would not have to be a faculty member. Okay. So if you're in the position of the directorship, what is the evidence that he was given that position for life? Which position? The directorship of the cancer institute. The evidence is that he was given the Dalton chair for life and to be able to have the, the CRI director had to be the Dalton chair. And because they're created in the same, they're not created exactly in the same document, but the Dalton endowment specifically, it takes cognizance of the CRI. So the CRI existed and then we have the Dalton endowment. So let me just say, let's assume that someone, not your client, but someone who chaired or was the director of the cancer institute was falsifying findings to the National Cancer Institute and putting in false federal claims and defrauding the government in some way. Would the university be able to terminate that individual? Absolutely. As director of the cancer institute? It would. It would do so through our analysis. You could do that, but you would have to have cause and you would have to have due process notice and opportunity to be heard. But even a faculty member can be removed for cause. Oh, sure. But I'm not asking now about the administrative people. They could be terminated for cause from an administrative position. And if, let's just say your client became disabled so he couldn't have the Dalton chair so they had to make someone else the head of the cancer institute, then if that person were involved in a federal fraud, they could be terminated. And once they were terminated, their chair would go as well, correct? Absolutely. Okay. So long as it was for cause and due process was provided. But I do want to point out one thing, that because the, you know. In a way you're not, that's different than saying, you know, that there's a lifetime appointment. You're basically saying it's not at will, in your view, but it's a cause-based termination has to be available. Yes. Okay. But that's also. Well, I was going to ask about that as well, because opposing counsel said that the directorship, as distinct from the endowed chair, is an administrative position and that the record is clear about that. Do you agree or disagree? I disagree. I agree with the trial judge who gave a pretty extensive analysis of exactly that issue. What concerned the trial judge was that although in its, you know, telephone directories and kind of collateral-type listings, the CRI was listed as an administrative position, is it didn't, none of the other conditions seem to exist. Number one is it had never been designated an administrative position, either at the time it was created or at the time that the Dalton chair was created linking the two. And number two, and most importantly, and this is where the judge said there's a huge fact issue on whether this is even an administrative position. The whole case will turn on whether it's an administrative position or not. But you agree that it doesn't fall under the normal faculty tenure box, correct? No. That's exactly right. That's out here. I've always thought that the tenure term was kind of a misfit in this case, quite frankly. Right. And that's been one of the problems because people, well, papers have used the word tenure, which is more viewed to the academic faculty track. Right. And you're really looking at employment with discharge only for cause, which is a different track. Exactly. The property enters created by mutually explicit expectations of continued employment for the clearly established law that's set forth. But back on the administrative position, what concerned the trial judge most from reading her opinion is that you did not have the required yearly reappointment letters to Dr. Pettit. And the university sent out these yearly reappointment letters to the directors of the CRI. The policy that's put in the record on administrative appointment requires those yearly reappointments. It's a critical feature of what an administrative appointment is. Dr. Pettit never received any of these yearly reappointment letters. If it's not an administrative position, what is it? It's a freestanding, honored Dr. Pettit Endowment Cancer Research Institute. It's simply a highly performing, functioning unit that the university was lucky enough to have and had it before it instituted a necessarily bureaucratic structure of administrative appointments and tenure systems. So where, then, what's the evidentiary base for this freestanding unit in terms of the property interest? What do we look to to credit your view on that? First of all, as I said before, they're linked on the dolphin chair. But I want to go to the Cancer Institute. What is the evidence that that is a property interest, a freestanding property interest? The evidence of it is that at the time that previous to the creation of the dolphin endowment and the dolphin chair, the CRI existed. There were no policies in place limiting it. It may very well be that before the dolphin chair, the CRI was not itself, as you put it, a freestanding property interest for the holder. But later, when the dolphin chair was then established and the dolphin funding became the major source of funding for the CRI and those two were linked together, from that point forward, our contention is that it became a tenure base. You have used your time, but I would like you to address the second prong of Saussure. Assuming that we either find in your favor or say that there's an issue of fact with respect to the existence of a property right, why is Provost Glick not entitled to qualified immunity on the lack of clarity as to whether there was such a property right giving rise to the right to a hearing? All right. Thank you for giving me that opportunity. Because the issue really is only as to whether there could be a hearing. Even a property right can be terminated. It's just a matter of whether there's a hearing. And there's not much clarity in the documentation that was available to him. All right. So if I could, though, first of all, as to the clearly established law basis for immunity is referring to clearly established constitutional law. It's not referring to clearly established statutory law, and it's certainly not referring to clearly established state law and state university policies. And I cited two courts in the ---- No. Can I be more specific in my question? Yes. The law was clearly established that one had to have a hearing in a public employment context like this if one had a property right to continued employment. That was clear. But what wasn't clear is that there was any property right. And that's the focus of my question. The law was out there, but why would he have known that this law applied to this situation? I've cited two cases that go to this proposition, Your Honor. As to the way you've rephrased it, I'd like to cite the second case in the brief, which is Kovitz v. Rutgers University's Third Circuit, 1987. And what the court said there is, we are not going to grant qualified immunity when the basis of the official saying that it wasn't clearly established to me is that he or she did not take the time and diligently inquire as to what the status of tenure or non-tenure was. In that case, it was whether it was a classified or unclassified position. Oh, gosh, I didn't know it was the classified one. And the court said, no, you're in that position. You're duty bound. Glick, just as the record would indicate, and Provost Glick had been at the university for a long, long time. He's one of the very senior folks there, such as Dr. Pettit. He would know all of these individuals that were involved, whether he knew all of the specifics and whether he bothered to go about finding out the specifics, I don't know, but that it was there for him to find out. He could have talked to these people the same as we did. The other case is the case of Cyberstein v. City of Dayton, which is the Sixth Circuit case in 2006, and cited in my brief. And they came to the same conclusion, is that to determine if it's clearly established law as to due process and property interests and whether a reasonable official would have known is you don't get that because the rules of the institution itself appear to not be clearly established, because qualified immunity goes on clearly established constitutional law. I also wanted to cite just one case for the Court. It was decided yesterday, so I found it last night. You'll have to take a sheet of paper and give that citation to the deputy clerk and to opposing counsel, and then they'll forward it to us as well. Thank you so much for your time. Thank you. You may have some rebuttal time as well. Thank you, Your Honor. In Brady v. Getty, the Court held that state law defines what is a property right. In that case, the Oregon statutes did not define whether an employee had a property right, whether it was classified or unclassified. The employee in that case claimed, like Dr. Pettit does, that an administrator promised him a property right, and therefore he tried to prove a mutually explicit understanding. And this Court held that even if Brady could show an implied contract of employment, he could not assert a property right based on that contract unless the contract was made pursuant to a statute or authorizing regulation. Therefore, it is Dr. Glick's contention that unless Dr. Pettit can show that he had a property right under the Arizona Board of Regents' rules, his claim fails. Even assuming, let's assume that we throw out the Arizona Board of Regents' rules and just look at implied contracts, Dr. Pettit's claims still fail, because in Arizona, to have an implied contract, oral statements of job security must be clear and unequivocal. And both Dr. Pettit and the former President testified that they don't remember any discussions of tenure, tenure track, a lifetime appointment. They simply assumed that these were lifetime appointments, but there is no clear and unequivocal promise of lifetime appointment. Dr. Pettit also argued that he could show a mutually explicit understanding under an equitable estoppel theory. Again, under Arizona law, that claim fails because to have equitable estoppel against the State, you must have a formalized written promise. And here, the importance of a written promise is especially apparent because Dr. Pettit wasn't removed for 25 years or 20 years. With no written documents to show that he had a property right, there was no reason for Dr. Glick to believe he had property rights in either position. Therefore, we believe Dr. Pettit fails on both steps of the qualified immunity analysis and ask you to rule in Dr. Glick's favor. Thank you. The case just argued is submitted, and I appreciate very much the good work from both counsel. We're going to take about ten minutes of recess before we continue with the calendar. All rise.
judges: Wallace, Graber, McKeown